PATRICIA RIVET MURRAY, Judge.
 

 bln this appeal, Officer Gibson, an employee of the New Orleans Police Department (NOPD), seeks reversal of the Civil Service Commission’s decision upholding an eighty-day disciplinary suspension imposed upon him by the appointing authority, the NOPD. The suspension consisted of twenty days for Officer Gibson’s violation of departmental rules requiring the reporting of an officer’s use of force in making an arrest, and sixty days for his violation of the departmental rules concerning truthfulness. Officer Gibson filed an appeal to the Commission, seeking review of the suspension. The Commission appointed a hearing officer to take testimony. Although the hearing officer recommended that the suspension be reversed, the Commission ultimately denied Officer’s Gibson’s appeal and upheld the appointing, authority’s action. For the reasons that follow, we reverse the Commission’s decision.
 

 FACTS AND PROCEEDINGS BELOW
 

 The incident which resulted in Officer Gibson’s suspension began when he responded to a call concerning Ms. Rhodes, who had suffered a dog bite. While the ambulance personnel were treating Ms. Rhodes, her neighbor Ms. Jackson, who had been in an earlier altercation with Ms. Rhodes, was standing in her |2doorway yelling at and taunting Ms. Rhodes. Officer Gibson approached Ms. Jackson, and
 
 *1034
 
 requested that she step outside her residence. When she refused, Officer Gibson grabbed her arm. According to Ms. Jackson, Officer Gibson then pulled her down the stairs and over a railing, causing an injury to her inner thigh.
 

 At the hearing, the NOPD called two witnesses: EMT Terry Boudreaux, and NOPD investigator Sgt. Gabriel.
 

 Mr. Boudreaux testified that he responded to a call for an ambulance for a lady with a leg injury. Mr. Boudreaux stated that when he and his partner, EMT Stefancik, arrived on the scene, Ms. Jackson was already in custody, sitting in an NOPD vehicle. Mr. Boudreaux testified he found an approximately one-inch long superficial abrasion on her upper left thigh and that there was no bleeding. Mr. Bou-dreaux’s report, introduced as an exhibit, stated “bleeding is controlled.” Mr. Bou-dreaux also testified that Ms. Jackson refused to be taken in an ambulance to the hospital. Mr. Boudreaux did not recall having spoken to any police officers on the scene. He also identified the ambulance dispatch reports, which showed that a different unit, manned by EMT’s Thore and Adams, had responded approximately forty minutes earlier to a dog-bite incident in the same block.
 

 After receiving a complaint from Ms. Jackson, the Public Integrity Bureau assigned Sgt. Gabriel to investigate the matter. According to Sgt. Gabriel, the incident occurred on February 6, 2007; Ms. Jackson went to the doctor on February 9, 2007, and filed a complaint on February 12, 2007. Sgt. Gabriel testified about the contents of Ms. Jackson’s complaint. It indicated that because Ms. Jackson had been in an argument with Ms. Rhodes earlier that day, Ms. Jackson had stood in her doorway yelling “God doesn’t like ugly” while the EMT was treating Ms. Rhodes. Officer Gibson had then approached Ms. Jackson and asked her to come Rdown the stairs, but when she refused, Officer Gibson had pulled her down by her arm, causing her to slip, fall backwards into her residence, and hit a piece of furniture, namely a coffee table, cabinet, or entertainment center. Officer Gibson had then come inside to arrest her, at which point Ms. Jackson swung her arm and knocked his tie off. He then dragged her outside and down the stairs by her wrist, causing her to scrape her groin area against the top of the jagged metal handrail.
 

 As part of his investigation, Sgt. Gabriel went to Ms. Jackson’s home to inspect the handrail and spoke with Ms. Jackson. He stated that the jeans Ms. Jackson said she wore that night showed some minor bleeding on the inside of the pants and were ripped in the area where the injury allegedly had occurred. There were no more than two to three steps leading to Ms. Jackson’s doorway. Sgt. Gabriel testified the edges of the stair rail were rough, such that pulling someone over the rail with a lot of force would probably have resulted in some type of injury.
 

 In addition, Sgt. Gabriel testified that Ms. Jackson told him two witnesses to the event had come forward. However, after speaking with them, Sgt. Gabriel determined their stories were too conflicting to be credible. One witness, Ms. Seals, stated that Officer Gibson had fallen on top of Ms. Jackson; whereas, the other, Ms. Wood, stated that Officer Gibson had entered Ms. Jackson’s home with a gun. Sgt. Gabriel testified that he believed these witnesses had been coerced into giving statements.
 

 Sgt. Gabriel also identified Ms. Jackson’s medical records. On the doctor’s screening form, Ms. Jackson had indicated she needed medical attention due to a police officer’s having pulled her out of her
 
 *1035
 
 door and over a damaged railing, scraping her pelvic area.
 

 ^Finally, Sgt. Gabriel testified that he had interviewed Officer Gibson as part of the investigation. In the interview Officer Gibson had claimed he had been standing next to the stair rail, with his body between the railing and Ms. Jackson, and that therefore the injury could not have occurred in the way Ms. Jackson had claimed. Sgt. Gabriel said he questioned Officer Gibson’s truthfulness because Officer Gibson was claiming he did not injure Ms. Jackson, despite the fact that Officer Gibson had called an ambulance. Sgt. Gabriel then identified the dispatch record for the event which revealed Officer Gibson had requested an ambulance for a leg injury. Sgt. Gabriel also noted that prior to requesting the ambulance, Officer Gibson had issued a request for additional police units because at some point, Ms. Jackson’s boyfriend had come outside. To prevent the boyfriend from interfering with Ms. Jackson’s arrest, Officer Gibson had pointed his gun at him.
 

 Sgt. Gabriel testified anytime an individual is arrested and complains of an injury, it is necessary for an officer to notify his supervisor of the injury or alleged injury. Sgt. Gabriel concluded that Officer Gibson had failed to notify his supervisor of Ms. Jackson’s complaint because there was no explanation of how her injury had occurred in Officer Gibson’s incident report, nor was there an injury report made by the supervisor. Officer Gibson’s report had indicated only that an ambulance had treated Ms. Jackson. Sgt. Gabriel testified that regardless of whether there has been an actual injury, any claim of injury should have generated a report from the supervisor. Sgt. Gabriel further testified that the presence of an ambulance on the scene would be enough to trigger such a report. According to Sgt. Gabriel, the use of force on a subject who is resisting arrest also requires a supervisor’s report. Because there was no such report made in this case, Sgt. |fiGabriel concluded Officer Gibson had not been truthful with his supervisor about his use of force and Ms. Jackson’s resulting injury.
 

 Officer Larissa Austin and Sgt. Davalier testified on behalf of Officer Gibson. Officer Austin said she had responded to Officer Gibson’s request for assistance. Officer Austin said she noticed Officer Gibson talking to his rank (supervisor); she also noticed that an ambulance was on the scene. The ambulance personnel had already examined Ms. Jackson. Officer Austin patted down Ms. Jackson before transporting her to the lockup. Officer Austin testified that Ms. Jackson did not speak on the way to the lockup. According to Officer Austin, when Ms. Jackson was asked at the lockup if she had any medical problems that required attention, she responded that she did not. Officer Austin also testified that the lockup will not accept a prisoner who is injured.
 

 Sgt. Davalier testified that he was the supervisor of Officer Gibson and had arrived on the scene after receiving a phone call from Officer Gibson. When Sgt. Da-valier arrived, he questioned Ms. Jackson, who stated that Officer Gibson had grabbed her and she had fallen across the railing; however, she also stated that she was not hurt. Sgt. Davalier testified that he observed no bruising or other signs of injury on Ms. Jackson. Although he offered to have Ms. Jackson transported to the hospital, she refused. Sgt. Davalier then spoke with Officer Gibson, who admitted that he had grabbed Ms. Jackson, but insisted that she had not fallen across the rail. Sgt. Davalier also testified that some third party told him that Ms. Jackson had fallen into the living room knocking over a table, but when he checked the
 
 *1036
 
 residence, Sgt. Davalier found nothing amiss.
 

 Sgt. Davalier testified that he concluded the incident was merely an arrest of individual who was not happy to be going to jail. He chose not to prepare a use of | ¡¡force report because there was no sign of a struggle and because Ms. Jackson claimed no injury, nor had any visible signs of injury. However, Sgt. Davalier recalled that he had told Officer Gibson on the phone to call an ambulance because Officer Gibson had admitted to having put his hands on Ms. Jackson during the arrest. Sgt. Davalier testified that he did not speak to the ambulance personnel, which he deemed unnecessary in light of Ms. Jackson’s statement of no injury and her refusal of treatment.
 

 Lastly, Officer Gibson testified on his own behalf. He said he was investigating a dog bite case when Ms. Jackson called out to the victim, “That’s good for you. I wish the dog would have ripped your f — ing arm off.” Officer Gibson approached Ms. Jackson and asked her to come down the stairs because he intended to issue her a summons for disturbing the peace. Ms. Jackson refused and began to get loud, at which point Officer Gibson noticed that some of the neighbors began to cross the street. Officer Gibson said he then walked up the stairs, grabbed Ms. Jackson by the right arm, and escorted her down the stairs to a car. Officer Gibson testified that his leg was between her two legs and he had one arm handcuffed when Ms. Jackson’s boyfriend began to approach. After drawing his weapon and ordering the boyfriend to stay back, Officer Gibson called for additional units. In addition, Officer Gibson requested that his supervisor, Sgt. Davalier, come to the scene, because Sgt. Davalier liked to be informed of everything. According to Officer Gibson, when he phoned Sgt. Dava-lier, Sgt. Davalier told him he was on his way and to make sure to call EMS. Officer Gibson stated that Sgt. Davalier and the additional police units arrived on the scene just as the EMT’s were examining Ms. Jackson. Officer Gibson then requested that Officer Austin take Ms. Jackson so that he could start writing his report in his 17vehicle. Officer Gibson testified that while he was sitting in his vehicle, one of the EMT’s approached and informed him that Ms. Jackson was not injured. Officer Gibson then requested that the EMT who was speaking to him give the same information to his supervisor. Officer Gibson testified that Sgt. Davalier also came to his vehicle and spoke to him. Sgt. Davalier asked him whether he had used any force that would require a use of force report, and he responded “No;” at which point Sgt. Davalier said “You didn’t use your baton or no mace, the spray?” Officer Gibson again said no, and Sgt. Davalier said “Okay, fine.” Sgt. Davalier then went over and spoke to Ms. Jackson. Later, he came back to the vehicle and instructed Officer Gibson to have his report on his desk in the morning.
 

 Officer Gibson first indicated that there were two different ambulance units: one that responded to the dog-bite incident and a separate one that responded to the call about Ms. Jackson. Later in his testimony, however, he said that the same ambulance that had responded the first time had returned to the scene to examine Ms. Jackson. Officer Gibson was never asked to explain this discrepancy in his testimony. In his testimony, Officer Gibson reiterated that Ms. Jackson did not fall at the scene, either in her house or on the railing. Officer Gibson stated he charged Ms. Jackson with disturbing the peace, resisting arrest, and criminal damage to property (because she had swung at him and knocked off his tie and tie tack, breaking his tie tack).
 

 
 *1037
 
 After hearing the testimony, the hearing officer recommended that Officer Gibson’s appeal be upheld based upon the testimony of his supervisor, Sgt. Davalier, and the fact that Ms. Jackson did not testify.
 

 However, the Commission denied the appeal. The Commission found that the record contained “troubling inconsistencies,” and that therefore the most Iscredible fact evidence came from the EMT’s and the ambulance dispatch records. The Commission particularly focused upon what it saw as an inconsistency between Officer Gibson’s maintaining that Ms. Jackson was not injured and the fact that he had called an ambulance to the scene. The Commission noted Officer Gibson was required by NOPD rules to notify his sergeant of any injury and could not rely on the ambulance personnel to do so. Specifically, the Commission stated, “[sjome form of injury was at least claimed by the citizen at some point, and this was not properly reported, thus violating department rules.”
 

 In addition, the Commission found that because Officer’s Gibson’s report listed only one ambulance as having been on the scene whereas his testimony was conflicting on this point, and the ambulance dispatch records showed there were two, Officer Gibson’s testimony was “disingenuous” and his report seemed calculated to deceive. The Commission concluded that the “incident report contained a number of factual errors and/or omissions of matters material to proper documentation of the incident.”
 

 STANDARD OF REVIEW
 

 The Commission has authority to “hear and decide” disciplinary cases, which includes the authority to modify (reduce) as well as to reverse or affirm a penalty. La. Const, art. X, § 12;
 
 Pope v. New Orleans Police Dept.,
 
 2004-1888, p. 5 (La. App. 4 Cir. 4/20/05), 903 So.2d 1, 4. The appointing authority is charged with the operation of its department, and it is within its discretion to discipline an employee for sufficient cause. The Commission is not charged with such discipline. The authority to reduce a penalty can only be exercised if there is insufficient cause for imposing the greater penalty.
 
 Pope,
 
 2004-1888, pp. 5-6, 903 So.2d at 4.
 

 |i)The appointing authority has the burden of proving, by a preponderance of the evidence, that the complained of activity or dereliction occurred, and that such dereliction bore a real and substantial relationship to the efficient operation of the appointing authority.
 
 Cure v. Dept, of Police,
 
 2007-0166, p. 2 (La.App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094,
 
 citing Man-íale v. Dept, of Police,
 
 2006-0459, p. 10 (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 767. The protection of civil service employees is only against firing (or other discipline) without cause. La. Const, art. X, § 12;
 
 Cornelius v. Dept, of Police,
 
 2007-1257, p. 8 (La.App. 4 Cir. 3/19/08), 981 So.2d 720, 724,
 
 citing Fihlman v. New Orleans Police Dept,
 
 2000-2360, p. 5 (La. App. 4 Cir. 10/31/01), 797 So.2d 783, 787.
 

 The decision of the Commission is subject to review on any question of law or fact upon appeal to this court, and this court may only review findings of fact using the manifestly erroneous/clearly wrong standard of review. La. Const, art. X, § 12;
 
 Cure,
 
 2007-0166, p. 2, 964 So.2d at 1094. In determining whether the disciplinary action was based on good cause and whether the punishment is commensurate with the infraction, this court should not modify the Commission order unless it was arbitrary, capricious, or characterized by an abuse of discretion.
 
 Id.
 
 A decision of the Commission is “arbitrary and capricious” if there is no rational basis for the action taken by the Commission.
 
 Cure,
 
 2007-0166, p. 2, 964 So.2d at 1095.
 

 
 *1038
 
 DISCUSSION
 

 In his first assignment of error, Officer Gibson argues the Commission committed manifest error in concluding that it was Officer Gibson’s responsibility to prepare a use of force report in connection with the incident at issue.
 

 | mThe record reflects that under the rules of the NOPD, an officer who utilizes force is responsible for notifying the appropriate supervisor within the chain of command to handle the use of force report. Once notification is received, the supervisor is responsible for preparation of the use of force report. The rules of the NOPD do not specify how an officer is to notify a supervisor of the use of force.
 

 In this instance, Officer Gibson notified his supervisor of the situation. Sgt. Da-valier arrived on the scene and personally spoke with Ms. Jackson. Ms. Jackson explained what had happened to Sgt. Davalier, but also assured Sgt. Davalier that she was not injured. Sgt. Davalier also spoke to Officer Gibson and got his version of what had happened. There is no indication that Officer Gibson lied to his supervisor or omitted crucial facts. To the contrary, the evidence indicates that Sgt. Davalier was fully apprised of the situation. According to Sgt. Davalier’s own testimony, he himself then determined that a use of force report was not necessary.
 

 Considering this evidence, we find no rational basis for the Commission’s finding that Officer Gibson violated the rules by failing to report the use of force to his supervisor. The record clearly reflects that Officer Gibson complied with his duty to inform his supervisor and that it was Sgt. Davalier’s decision not to report the use of force. Therefore we find the Commission’s decision to uphold the twenty-day suspension imposed for the failure to report the use of force to be arbitrary and capricious, and we reverse that decision.
 

 In his second assignment of error, Officer Gibson argues the Commission committed manifest error in upholding a sixty-day suspension for his alleged untruthfulness.
 

 In concluding that Officer Gibson was untruthful in his statements about Ms. Jackson’s injury, the Commission relied upon the ambulance and dispatch records. |nThe dispatch records show only that Officer Gibson requested an ambulance to the location for a leg injury, which is not inconsistent with Officer Gibson’s testimony that he did so only because Sgt. Davalier had ordered him to, not because he believed Ms. Jackson was injured. Sgt. Davalier confirmed Officer Gibson’s statement. The Commission’s decision mis-characterizes the evidence by concluding that Officer Gibson’s denial that any injury occurred was untruthful because his call for an ambulance “could only have arisen from a claim of injury.” Therefore, we find the Commission abused its discretion by determining that the evidence proved Officer Gibson was untruthful. Moreover, we do not agree with the Commission’s conclusion that Officer Gibson’s failure to mention in his report that there were two separate ambulances (rather than one) is proof of his intent to deceive. Because this distinction does not seem significant in light of the overall incident Officer Gibson was reporting, it seems just as likely that Officer Gibson either overlooked this detail when making his report, or, as is indicated by his conflicting testimony, was confused as to whether the second ambulance was the same or a different unit from the one that had responded initially. We therefore find the Commission’s decision to uphold the sixty-day suspension for untruthfulness to be manifestly erroneous in light of the record.
 

 CONCLUSION
 

 Accordingly, the decision of the Commission denying Officer Gibson’s appeal of his
 
 *1039
 
 eighty-day suspension is reversed. Officer Gibson is entitled to all back pay and emoluments of office for those eighty days.
 

 REVERSED.